UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

N⁰ 11-CV-1991 (JFB)
_____

BRADFORD P. HANES,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

**MEMORANDUM AND ORDER**
September 14, 2012
_____

JOSEPH F. BIANCO, District Judge:

Bradford P. Hanes (the "plaintiff" or "Hanes") commenced this action, pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's decision to deny his application for disability insurance benefits ("DIB"). Plaintiff contends, among other things, that (1) the Administrative Law Judge ("ALJ") failed to properly and accurately address all of the treatment records and opinion by Hanes' treating and board-certified orthopedist, Dr. Stuart Springer; and (2) the ALJ failed to properly address Hanes' subjective complaints. Presently before the Court are the parties' motions for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

For the reasons that follow, the case is remanded to the ALJ for further proceedings in accordance with this Memorandum and Order. It is undisputed that the ALJ, in rejecting the opinion of the treating physician, made misstatements regarding the number and dates of visits plaintiff had with Dr. Springer. In particular, the ALJ relied, in part, on his belief that plaintiff received no medical attention from 2001 to 2004, except when he saw Dr. Springer for his medical board application, and then had no medical attention until November 2008. That factual statement by the ALJ is erroneous because the record clearly indicates that plaintiff received medical attention from Dr. Springer on a number of occasions during that timeframe. Although defendant argues that this factual error was harmless and no remand is required because the overlooked treatment was sporadic and other evidence in the record undermined the treating physician's opinion, the Court believes a remand is warranted. The Court recognizes that there is evidence in the

1

record that undermines Dr. Springer's opinion. However, the Court is unable to conclude, under the particular circumstances of this case, that the ALJ's decision was not materially impacted by his erroneous factual assertion and his apparent failure to consider certain medical information from the treating physician. A conclusion by this Court that the factual error in this case was harmless would simply be speculation, and thus, remand is warranted to ensure that the ALJ fully considers this overlooked medical information in light of the entire record pursuant to the treating physician rule, and thoroughly applies the requisite factors to decide how much weight to give Dr. Springer's opinion.

I. BACKGROUND

A. Facts

As discussed *infra*, plaintiff has alleged a history of pain in his right ankle, left shoulder and knees.

1. Summary of Plaintiff's Work History

Plaintiff was born in 1957 and has a high-school education. (AR[1] 28.) Plaintiff worked as a police officer for the New York City Police Department (the "NYPD") for approximately twenty years. (AR 29, 134, 156.) Plaintiff ceased working full-time at the NYPD in December 2001, and testified that he retired from the NYPD in March 2002 as a result of an NYPD Medical Board decision. (AR 28-29.) Plaintiff retired as a Sergeant and received disability compensation of approximately $6,500 per month as a result of the Medical Board decision. (AR 29, 134, 341.)

Since retiring from full-time employment, plaintiff has worked on a part-time basis in several different capacities. (AR 29.) Plaintiff utilized his notary license to conduct title closings for home equity lines of credit from June 2002 to 2005. (AR 29-30, 42, 44-45.) Plaintiff would attend the closing in somebody's home, carry a briefcase with documents, present the papers to the customer, check their identification, sign it, and put his notary stamp on the documents. (AR 43-44, 157.) Afterwards, he would return home and send the documents back to the title company. (AR 43.) He performed these title closings approximately once per week. (AR 30.) Plaintiff testified that he might have conducted more title closings if more had been available, but that he "turned down a lot of work" because the closings were far away. (AR 43.) He last worked for the title company in approximately 2005 because the company stopped calling him with jobs. (AR 44-45.)

Plaintiff also has worked part-time for Strategic Security Company from 2002 through the present. (AR 30, 45-46.) Plaintiff performed security work in building lobbies. (AR 30.) This work included greeting people, checking their identification, and picking up a telephone to announce guests. (AR 30, 36, 46.) In this job, plaintiff was provided with a desk and a seat and was permitted to sit or stand. (AR 36.) In plaintiff's Work History Report provided to the Social Security Administration, plaintiff indicated that, in any given day, he walked and stood for five or more hours and did not sit at all. (AR 159.) However, he testified that he could not do this job consistently due to pain. (AR 36.)

Plaintiff reported that he could work an eight-hour shift, but that he would need a couple days to recover, to soak himself, and to get the swelling down. (AR 37.) Shifts

---

[1] "AR" refers to the administrative record filed on appeal.

2

were from 8:00 a.m. to 4:00 p.m., or from 4:00 p.m. to 12:00 a.m. (AR 30, 45.) Plaintiff estimated that he typically worked once or twice per month, but occasionally worked up to three days when filling in for colleagues. (AR 46.) Plaintiff did not believe that he could consistently perform the security job five days a week. (AR 37.) Occasionally, plaintiff would also perform investigative work for the company on his home computer. (AR 47.) Plaintiff stated that he could write and use a computer without difficulty. (AR 34-35.)

Plaintiff testified that he lived in a second floor apartment and climbed the stairs approximately twice per day. (AR 28.) A typical non-work day for the plaintiff included waking up around 8:00 a.m., showering, watching television, and doing home physical therapy. (AR 38.)

Plaintiff tried to incorporate his physical therapy into his housework. (AR 39.) He vacuumed, cooked a little, shopped with his girlfriend, and drove. (AR 39.) He could dress himself and make his bed. (AR 49.) In 2008, plaintiff flew to Europe with his girlfriend for a vacation that included a cruise and bus tours. (AR 50-51.) Plaintiff enjoyed fishing and often went fishing one to two times per week at the pier in Oyster Bay. (AR 37.)

2. Medical Evidence Prior to the Alleged March 20, 2002 Onset Date

On February 1, 1998, plaintiff injured his right foot while on duty with the NYPD and went to the emergency room at St. Vincent's Hospital. (AR 197-210.) Plaintiff underwent a physical examination that indicated right ankle pain and swelling. (AR 199.) An x-ray upon admission showed a bilateral malleolar fracture and soft tissue swelling in plaintiff's right ankle. (AR 199-201.) On February 3, 1998, orthopedic surgeon Basil Dalavagas, M.D. ("Dr. Dalavagas"), performed surgery on plaintiff's right ankle, inserting a plate and screws. (AR 197-99, 202.) Postoperatively, plaintiff was placed in a splint to accommodate swelling until the swelling decreased to the point where he was considered stable for discharge. (AR 199.) Plaintiff was subsequently discharged from the hospital on February 6, 1998. (AR 199.)

Dr. Dalavagas saw plaintiff for follow-up appointments on March 4, 1998, March 18, 1998, and April 13, 1998. (AR 214.) In Dr. Dalavagas' follow-up report, he noted that a clinical examination showed improvement in the range of motion in plaintiff's right ankle. (AR 212-14.) An x-ray showed good healing of the bimalleolar fracture and no fracture lines. (AR 212-14.)

Physical therapist Seth Meisel ("Meisel") subsequently evaluated plaintiff. (AR 215.) Upon initial evaluation following surgery, plaintiff's ankle strength was limited to 3+/5 for both dorsiflexion and plantarflexion and 3/5 for both inversion and eversion. (AR 215.) In a report dated April 27, 1998, Meisel noted that plaintiff's ankle strength had increased since surgery. (AR 215.) Plaintiff's ankle dorsiflexion had increased to 4-/5. (AR 215.) By June 5, 1998, plaintiff's ankle strength had improved to a 4+/5 for both dorsiflexion and plantarflexion and to 4/5 for both inversion and eversion. (AR 216.) Plaintiff no longer required the use of a crutch, but he still found jumping and running difficult and only possible for brief periods of time. (AR 216.)

On April 6, 1999, Dr. Dalavagas performed a second surgery on plaintiff to remove the surgical fixation device previously implanted in plaintiff's right

3

ankle. (AR 314-16.) Subsequently, plaintiff returned to physical therapy with Meisel from June 7, 1999 through September 1, 1999. (AR 218-24.) Upon preliminary evaluation following the hardware removal, Meisel found that swelling in plaintiff's right ankle was present, though pain was minimal. (AR 218.) By the time of discharge in September 1999, plaintiff had ankle strength of 5/5 for dorsiflexion and 4+/5 for plantarflexion, inversion and eversion. (AR 224.) Short distance jogging was possible, with pain being absent at times, and minimal at other times. (AR 224.)

Plaintiff first saw orthopedic surgeon Stuart Springer, M.D. ("Dr. Springer"), on February 15, 2001. (AR 263.) Plaintiff complained of recurrent right ankle swelling and discomfort that arose after standing or going up and down stairs for extended periods of time. (AR 263.) Dr. Springer's physical exam noted that plaintiff had mildly reduced range of motion in the right ankle and healed surgical scars. (AR 263.) Moreover, there was tenderness along the medial malleolus, the lateral malleolus, and in the fibula collateral ligament area. (AR 263.) X-rays revealed a mended fracture of the right ankle with early degenerative joint disease and some loose bodies in the ankle joint. (AR 263.) Dr. Springer recommended stretching exercises and anti-inflammatories, if necessary. (AR 263.) Dr. Springer stated that he would consider further arthroscopic surgery if plaintiff's symptomology worsened. (AR 263.) Dr. Springer also noted that plaintiff complained of knee pain after he was in an altercation during which his left knee suddenly locked up. (AR 225.) Both knees suffered slight abrasions and were slightly puffy, but had an excellent range of motion. (AR 225.) Dr. Springer diagnosed plaintiff with traumatic bilateral chondromalacia of the patellae and believed that a home exercise program would be sufficient to maintain strength. (AR 225.)

On May 14, 2001, the NYPD's Medical Board Police Pension Fund Article II (the "Medical Board") reviewed plaintiff's application for Accident Disability Retirement. (AR 265-67.) The Medical Board had previously denied plaintiff's original application on December 18, 2000. (AR 265.) Plaintiff's physical examination at that time "was described essentially as normal." (AR 265.) When the Medical Board reviewed plaintiff's May 2001 application, it noted that plaintiff stated that his symptoms continued to be the same. (AR 266.)

The Medical Board performed a physical examination of plaintiff and plaintiff was able to stand on his toes and heels. (AR 266.) Plaintiff was able to squat down almost fully without assistance. (AR 266.) The examination also revealed a bony prominence on the right side, which was a result of the injury and subsequent surgeries. (AR 266.) Moreover, the Medical Board found no soft tissue swelling and no effusion in the ankle. (AR 266.) Though there was decreased sensation in the heel, the incisions were well-healed and not tender. (AR 266.) Plaintiff did not experience pain when conducting the physical movements involved in the examination. (AR 266.) The Medical Board reaffirmed its disapproval of plaintiff's application because it felt that plaintiff could still perform the full duties of a New York City police officer. (AR 267.)

Dr. Springer re-evaluated Plaintiff on November 15, 2001. (AR 226, 286.) Dr. Springer reported that plaintiff's bilateral knee pain remained symptomatic, but had not become significantly worse. (AR 226.) Plaintiff reported that he felt increasing pain on a more monthly basis than he had felt

4

previously, which coincided with some swelling and sensitivity along the anterior fibula collateral ligament area. (AR 226.)

On January 28, 2002, the NYPD Medical Board reviewed plaintiff's third application for Accident Disability Retirement and acknowledged Dr. Springer's November 2001 examination report. (AR 341-43.) The Medical Board also pointed to an examination report by Dr. Axlerod from January 8, 2002. (AR 342.) This report concluded that the likelihood of plaintiff returning to full duty as a Sergeant was "nil." (AR 342.) Plaintiff reported unchanged symptomology, and the Medical Board's physical examination showed that plaintiff was able to walk on his toes and heels and squat fully without assistance. (AR 342.) The examination also showed some sensitivity of the incision over the lateral malleolus, the distal fibula and at the medial malleolus. (AR 342.) There was some tenderness in the area of the tarsal bones and the medial and lateral malleolus, but sensation and pulses were normal. (AR 342.)

Ultimately, the Medical Board concluded that significant objective findings precluded plaintiff from performing the full duties of a New York City Police Officer. (AR 342.) The Medical Board, therefore, rescinded its previous decision and unanimously recommended approval of plaintiff's application for Accident Disability Retirement. (AR 342.) The Board's final diagnosis was "Chronic Recurrent Derangement of the Right Ankle, Unresolved." (AR 342-43.)

3. Medical Evidence Subsequent to the Alleged March 20, 2002 Onset Date

On August 12, 2002, Dr. Springer completed a physician's statement in which he indicated that he was treating plaintiff for degenerative joint disease of the right ankle. (AR 270-71.) Dr. Springer noted that he most recently examined plaintiff on August 8, 2002. (AR 271.) Dr. Springer reported symptoms of stiffness, pain and swelling in that ankle. (AR 270.) Plaintiff's treatment plan at the time consisted of a home exercise program. (AR 270.) Dr. Springer opined that plaintiff was restricted from performing his past duties as a police officer and that his work-related restrictions were permanent. (AR 271.) Additionally, Dr. Springer believed that plaintiff was limited to sedentary work only. (AR 271.)

Defendant alleges that plaintiff sought no further medical attention until June 27, 2005. (AR 289.) However, as plaintiff notes in his brief, there is an attending physician statement in the administrative record that indicates plaintiff was treated or evaluated on July 24, 2003. (AR 301.)

Plaintiff returned to see Dr. Springer on June 27, 2005. (AR 289.)[2] On June 30, 2005, plaintiff underwent a magnetic resonance imaging ("MRI") study of his right ankle. (AR 273-74.) The radiologist described plaintiff as "a 47-year-old male with swelling for three months." (AR 273.) The MRI exam revealed normal findings except for posttraumatic arthrosis of the tibiotalar joint, a small tibiotalar joint effusion and a calcaneal valgus deformity. (AR 273-74.)

On July 14, 2005, Dr. Springer completed another Attending Physician's Statement and diagnosed plaintiff with status post-bimalleolar fracture of the right ankle with effusion and early arthrosis. (AR 298.) Dr. Springer stated that plaintiff's symptoms included occasional pain,

---

[2] Both parties point out that Dr. Springer's notes from that date are difficult to read. (AR 289.)

5

swelling, and stiffness, though he failed to quantify the severity. (AR 298.) Plaintiff's present treatment was a home exercise program, with which he was believed to be compliant. (AR 298.) Dr. Springer again opined that plaintiff was unable to return to work as a police officer. (AR 299.)

On July 26, 2005, physical therapist Marsha Levenson, P.T. ("Levenson"), performed an upper extremity evaluation on plaintiff. (AR 299-30, 241-42, 296-97.) Plaintiff complained of increased pain in his left shoulder and elbow, as well as his left hip. (AR 230.) Levenson diagnosed left rotator cuff tendinitis and left lateral epicondylitis. (AR 229, 295.) The examination showed reduced range of motion in the left shoulder and elbow, and left shoulder motor strength of 3+/5. (AR 229.) Left elbow flexion and extension was listed as 4-/5 and 3+/5, respectively. (AR 229.) Plaintiff described his pain level as 7 out of 10. (AR 230.) Levenson noted that plaintiff had no neurological deficits, but had a decreased ability when lifting heavy objects and taking long walks. (AR 230.)

Plaintiff attended physical therapy for approximately the next month. (AR 243.) A report from Levenson, on August 25, 2005, confirms a diagnosis of rotator cuff tendonitis and left lateral epicondylitis. (AR 247.) The report shows that plaintiff's left shoulder and elbow pain had decreased from 7/10 to 5/10. (AR 247.) Levenson also reported a forty-percent increase in activity of daily living function and a sixty-percent increase in shoulder and elbow flexibility. (AR 247.)

Dr. Springer ordered an MRI of plaintiff's left shoulder on or about September 16, 2005. (AR 276.) Dr. Springer's report indicates that plaintiff's left shoulder displayed a three-millimeter partial thickness tear of the Supraspinatus tendon, a three-millimeter partial thickness tear of the Infraspinatus tendon, possible mild impingement, and degenerated glenoid labra. (AR 276-78.) On November 28, 2005, a chest x-ray of plaintiff was described as "unremarkable." (AR 279.) On December 2, 2005, an electrocardiogram was normal except for rate. (AR 282.) On December 5, 2005, plaintiff was cleared for anesthesia and surgery. (AR 233-35.)

On December 9, 2005, Dr. Springer issued a pre-operative report in which plaintiff reported a history of pain in his left shoulder for the previous twelve months. (AR 232.) On the same day, Dr. Springer performed arthroscopic surgery on plaintiff's left shoulder. (AR 235-37.) Dr. Springer issued his postoperative diagnoses as a "partial rotator cuff tear, left shoulder with labral tear and impingement," and a superior labral anteroposterior ("SLAP") lesion with a labral tear. (AR 225.) Dr. Springer also diagnosed a tear on the A-side of the rotator cuff and subacromial bursitis. (AR 225.)

On January 4, 2006, Dr. Springer noted that plaintiff was doing quite well. (AR 293.) On January 25, 2006, physical therapist Levenson provided an update on plaintiff's shoulder status. (AR 249-50.) The muscular strength and range of motion of plaintiff's left shoulder was limited to 2-/5. (AR 249.) Plaintiff described his pain at a "10" on a scale from 1 to 10. (AR 250.) Plaintiff was unable to reach behind his head or back, but had no neurological deficits. (AR 250.)

On February 3, 2006, plaintiff reported decreased pain, decreased tenderness, decreased stiffness, and increased flexibility with physical therapy. (AR 251.) Plaintiff stated he was unable to lift more than one pound and experienced difficulty when performing overhead activities. (AR 251.)

6

By February 6, 2006, plaintiff noted that he was feeling better. (AR 251.) On February 8, 2006, plaintiff complained again of pain and stiffness. (AR 251.) On February 24, 2006, plaintiff stated that his pain level was at 8/10. (AR 254.) Levenson reported that plaintiff's left shoulder range of motion and strength had increased to 3+/5, but that plaintiff still had difficulty lifting, pushing and pulling. (AR 254.)

On March 24, 2006, Levenson noted that plaintiff's pain level had decreased to 7/10 and had a strength rating of 4-/5. (AR 257.) Throughout April 2006, plaintiff told Levenson that his shoulder felt better. (AR 260-61.)

In May 2006, Dr. Springer completed another Attending Physician's Statement. (AR 305-07.) Dr. Springer noted that he last treated plaintiff on January 4, 2006. (AR 306.) Plaintiff's treatment program was a home exercise program. (AR 305.) Dr. Springer repeated that plaintiff was limited to sedentary work. (AR 306.)

On April 30, 2007, Steven Calvino, M.D. ("Dr. Calvino"), completed a consultative examination of plaintiff. (AR 330-34.) The New York State Division of Disability Determination referred plaintiff to Dr. Calvino for an orthopedic examination.[3] (AR 330.)

Plaintiff told Dr. Calvino that he had had a longstanding history of right ankle pain ever since he sustained a right ankle fracture in 1998. (AR 330.) Plaintiff described the right ankle pain as a constant stiffening sensation that occurred mainly in the morning upon awakening. (AR 330.) Plaintiff stated that he suffers from swelling of the ankle throughout the day after prolonged standing or walking. (AR 330.) Plaintiff stated that the pain in the right ankle occurs intermittently, mainly with prolonged standing. (AR 330.) At the time of the consultative examination, plaintiff rated his right ankle pain level as a 3 on a 10-point scale. (AR 330.) Dr. Calvino noted that plaintiff was not participating in any physical therapy program at that time for his ankle pain. (AR 330.)

Plaintiff also complained of left shoulder pain that has been present ever since undergoing surgery to repair a labral tear on the left shoulder. (AR 330.) Plaintiff complained of occasional, nonradiating pain in the left shoulder that mainly occurs with any repetitive overhead activity. (AR 330.) Plaintiff rated his left shoulder pain as 0 on a 10-point scale. (AR 330.) Plaintiff denied any focal numbness in the ankle or shoulder, though he did report intermittent tingling in the right ankle. (AR 330-31.)

Plaintiff reported a history of asthma and a prescription for an Albuterol inhaler. (AR 331.) Plaintiff went on to describe his activities of daily living for Dr. Calvino. (AR 331.) Plaintiff stated that he cooks two to three times per week, cleans once per week, and showers and dresses himself daily. (AR 331.) Additionally, plaintiff's activities include watching TV, listening to the radio, reading, going out to the store, socializing with friends, and fishing. (AR 331.)

Dr. Calvino's physical examination showed that plaintiff appeared to be in no acute distress. (AR 332.) Plaintiff had normal gait and station, could walk on his heels and toes without difficulty, and could squat fully. (AR 332.) Plaintiff needed no help changing for the exam or getting on and

---

[3] Plaintiff, in his brief in support of his cross-motion for judgment on the pleadings, explains that the Division of Disability Determination is the state agency charged with conducting initial disability determinations for the Social Security Administration. (Pl.'s Br. 13.)

off the exam table. (AR 332.) Plaintiff was also able to rise from a chair without difficulty. (AR 332.)

Plaintiff's hand and finger dexterity was intact with grip strength of 5/5 bilaterally. (AR 332.) Dr. Calvino examined plaintiff's upper extremities. (AR 332.) Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally. (AR 332.) Strength in plaintiff's distal and proximal muscles was listed as 5/5 bilaterally. (AR 332.) Plaintiff showed no evidence of joint inflammation, effusion, instability, or sensory abnormality. (AR 332.)

Dr. Calvino also examined plaintiff's lower extremities. (AR 332.) Plaintiff had full range of motion in his hips, knees, and ankles bilaterally. (AR 332.) Strength in plaintiff's distal and proximal muscles was listed as 5/5 bilaterally. (AR 332.) Moreover, an x-ray on plaintiff's left shoulder was unremarkable. (AR 332.)

On November 6, 2008, Dr. Springer wrote a letter to plaintiff's attorney in which he reviewed plaintiff's treatment history. (AR 344.) Dr. Springer described that plaintiff had had intermittent pain and swelling with reduced range of motion of the right ankle since surgery in 1998. (AR 344.) Dr. Springer pointed out that he had treated plaintiff's ankle injury "conservatively." (AR 344.) Dr. Springer recognized that further surgery would be considered if plaintiff's injury continued to restrict his movements or worsened in time. (AR 344.)

Dr. Springer also noted that plaintiff had developed a left shoulder problem. (AR 344.) Plaintiff underwent arthroscopic surgery in 2005 with a repair of the SLAP lesion, removal of tears of the glenoid labrum, and a debridement of the rotator cuff with subacromial decompression. (AR 344.) Plaintiff had undergone a "good course" of physical therapy, but periodically had had problems with intermittent tendonitis that reduced his range of motion and strength. (AR 344.)

Dr. Springer explained that plaintiff's injuries had severely restricted his ability to perform activities of daily living. (AR 344.) Specifically, Dr. Springer noted that plaintiff's right ankle injury had restricted his movement and that his left shoulder injury reduced his ability to lift, carry, and push objects. (AR 344.) Dr. Springer believed these changes were permanent in nature and could possibly worsen over the years. (AR 344.)

### 4. Plaintiff's Application to the Social Security Administration

Plaintiff filed an application to the Social Security Administration (the "SSA") for disability insurance benefits on June 12, 2006. (AR 98.) Plaintiff originally alleged that he was disabled beginning February 1, 1998. (AR 98, 133.) Plaintiff subsequently amended his alleged onset date, claiming that he was disabled beginning March 30, 2002. (AR 120.) The SSA denied the application. (AR 64-71.) Plaintiff appealed the SSA's decision and requested a hearing before an Administrative Law Judge (the "ALJ") Seymour Rayner. (AR 72.) The hearing took place on February 17, 2007. (AR 24-52.) The ALJ subsequently denied plaintiff's claim. (AR 23.)

Plaintiff consequently filed a request for review of the ALJ's decision. (AR 11, 13-14.) The Appeals Council denied plaintiff's request for review on March 3, 2011, rendering the ALJ's decision final. (AR 1.)

8

B. Procedural History

On April 22, 2011, plaintiff filed the complaint in this action. On August 16, 2011, the Commissioner filed his answer to plaintiff's complaint. The Commissioner filed a motion for judgment on the pleadings on November 15, 2011. Plaintiff filed his opposition and cross-motion for judgment on the pleadings on February 21, 2012.[4] The Commissioner filed a reply in further support of the motion for judgment on the pleadings and in opposition to plaintiff's cross-motion on March 28, 2012. The plaintiff filed a reply memorandum in support of the cross-motion for judgment on the pleadings on April 16, 2012. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is "based upon legal error" or "not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotations and citations omitted)). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

In order to obtain a remand based on additional evidence, a plaintiff must present new evidence that: "(1) is 'new' and not merely cumulative of what is already in the record[;]" (2) is material, in that it is "relevant to the claimant's condition during the time period for which benefits were denied," probative, and presents a reasonable possibility that the additional evidence would have resulted in a different determination by the Commissioner; and (3) was not presented earlier due to good cause. *Lisa v. Sec'y of the Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).

III. DISCUSSION

A. Legal Standard for Disability Determinations

A claimant is entitled to disability benefits under the SSA if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

---

[4] Petitioner commenced this action *pro se*. On January 9, 2012, Christopher J. Bowes, Esq., filed a Notice of Appearance on behalf of plaintiff and requested an extension of time to file a cross-motion, which was subsequently granted by the Court.

9

for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

In the event the claimant is found to be disabled, the Commissioner must also determine if the disability continues through the date of decision. The Commissioner has promulgated regulations establishing an eight-step procedure for evaluating whether the disability continues or ends.

> First, the Commissioner determines whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If so, the Commissioner will find that the disability ended. *Id.* If not, the Commissioner's review proceeds.
>
> Second, the Commissioner determines whether the claimant's impairment or combination of impairments meets or equals the severity of an impairment listed in Appendix 1. 20 C.F.R. § 404.1594(f)(2). If so, the claimant's disability is said to continue. *Id.* If not, the Commissioner's review proceeds.

10

Third, the Commissioner determines whether there has been medical improvement. 20 C.F.R. § 404.1594(f)(3). If there is no decrease in medical severity, there is no medical improvement. Upon finding medical improvement, measured by a decrease in medical severity, the Commissioner's review continues.

Fourth, the Commissioner determines whether the medical improvement found in step three is related to the claimant's ability to do work in accordance with 20 C.F.R. §§ 404.1594(b)(1)-(4). Medical improvement is related to the ability to work if it results in an increase in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1594(b)(3). If medical improvement is unrelated to the claimant's ability to work, the Commissioner proceeds to step five. *Id.* If the medical improvement is related to the claimant's ability to work the Commissioner proceeds to step six. *Id.*

Fifth, the Commissioner considers whether the exceptions to medical improvement listed in 20 C.F.R. §§ 404.1594(d) and (e) apply to the claimant's medical improvement. 20 C.F.R. § 404.1594(f)(5). If none apply, the claimant's disability continues. *Id.*

Sixth, if medical improvement is related to the claimant's ability to do work or one of the aforementioned exceptions applies, the Commissioner will determine whether the claimant's impairments are severe. 20 C.F.R. § 404.1594(f)(6). When the evidence shows that all current impairments do not significantly limit the claimant's physical or mental abilities to perform basic work activities, the impairments are not severe and the claimant will no longer be considered disabled. *Id.*

Seventh, if the claimant's impairments are severe, the Commissioner will assess the claimant's residual functional capacity based upon all current impairments and determine whether claimant is able to perform past work. 20 C.F.R. § 404.1594(f)(7). If capable of doing past work, the claimant is no longer disabled. *Id.*

Finally, if the claimant can no longer perform past work, the Commissioner must determine whether the claimant is capable of other work given her residual functional capacity assessment and her age, education, and previous work experience. 20 C.F.R. § 404.1594(f)(8). If the claimant is capable, her disability will have ended. *Id.* If the claimant is incapable, her disability is found to continue. *Id.*

*Wilson v. Astrue*, No. 09-CV-732S, 2010 WL 2854447, at *2-3 (W.D.N.Y. July 19, 2010) (footnotes omitted).

### B. Treating Physician Rule

Plaintiff asserts that the ALJ failed to fully consider the opinion of the treating physician, Dr. Stuart Springer. Specifically, plaintiff contends:

[T]he ALJ completely failed to acknowledge that Mr. Hanes' treating orthopedic surgeon, Dr.

11

Stuart Springer, had repeatedly opined that Mr. Hanes was limited to sedentary work as a result of a traumatic bimalleolar fracture of the right ankle. Tr. 271 (August 2002 – "Sedentary only"), 301 (July 2003 – "sedentary at this time") and 306 (January 2006 – "sedentary ok"); see Pl. Br. at 18. Additionally, Dr. Springer further stated in November 2008 that Mr. Hanes had a "severely restricted" [sic] Mr. Hanes' activities of daily living that the condition would only deteriorate over time. Tr. 344. Thus, plaintiff submits, the record contains specific medical opinion, supported with adequate rationale, to restrict Mr. Hanes from performing light work. See Pl.'s Br. at 21. Moreover, with a restriction to sedentary work, a finding of "disabled" would be applicable upon the age of attainment of age 50 in October 2007. Id.

(Pl.'s Reply Br. at 1.) Plaintiff further contends that the ALJ overlooked substantial treatment history by the treating physician. (*See* Pl.'s Brief, at 20 ("ALJ Raynor could not have properly followed the treating physician regulations where his review of the record mischaracterized and omitted from consideration such a substantial treatment history.")).

As set forth below, the Court concludes that the ALJ, in rejecting the opinion of the treating physician, overlooked certain medical information and failed to give sufficient reasons for not giving controlling weight to the opinion of plaintiff's treating physician, Dr. Springer. Thus, the case must be remanded for such a determination.

1. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physical rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The rule, as set forth in the regulations, provide:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the

Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. *see Clark*, 143 F.3d at 118 (citing 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2)). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion. *Clark*, 143 F.3d at 118 (quoting 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2)); *see also, e.g.*, *Perez v. Astrue* No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources."). A failure by the Commissioner to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

2. Application

With respect to treating physician Dr. Springer, the ALJ wrote the following:

The claimant had no medical treatment until 2004, a lapse of three years, except for when he saw Dr. Springer for his medical board application, which was successful. (Exhibit 14F). Thereafter, the next medical attention was in November 2008, a lapse of six years. Less weight is given to Dr. Springer's evaluations, since he did not consider the claimant's activities of daily living, his fishing, use of a computer, his jobs and his ability to travel abroad. No EMG was had. In 2002, the claimant worked as a security officer and earned $24, 661. In 2003, he earned $7,078. In 2004, he earned $782, in 2005 $3,567 and in 2006 he earned $1,215. The claimant's earnings after leaving the police department are reflective of his ability to do substantial gainful activity. In fact, the claimant's ability to work over the many years at the same security officer job indicates he could do full-time substantial gainful activity. Greater weight is given to the consultative examiner report, as it is well-supported by the diagnostic testing and the claimant's activities of daily living.

(AR 21-22.)

As a threshold matter, there is an error in the ALJ's recitation of the facts, and thus, remand is appropriate. *See Mieczkowski v. Astrue*, No. 07-CV-0141 (JFB)(SMG), 2008 WL 899344, at *11 (E.D.N.Y. Mar. 31, 2008) (finding that factual inaccuracies in an ALJ's decision can be a contributing cause for remand); *see also Renaudette v. Astrue*, 482 F. Supp. 2d 121, 132 (D. Mass. 2007) ("The ALJ's decision is riddled with factual errors and misstatements. The cumulative effect of these mistakes undermines any

13

confidence [] that the evidence in the plaintiff's case has been fully and fairly considered . . ."). Specifically, the ALJ claims that plaintiff had no medical attention from 2001 to 2004, and thereafter no medical attention until 2008. (AR 21.) However, the administrative record indicates that plaintiff received medical attention on a number of occasions during those time spans. Dr. Springer completed a physician's statement concerning plaintiff on August 12, 2002, and noted that he examined plaintiff on August 8, 2002. (AR 270-71.) A separate attending physician's statement completed by Dr. Springer indicates that plaintiff was treated or evaluated on July 24, 2003. (AR 301.) Plaintiff saw Dr. Springer on June 30, 2005 and underwent an MRI. (AR 273-74.) Dr. Springer met with plaintiff on June 27, 2005. (AR 289.) On July 14, 2005, Dr. Springer completed another attending physician's statement and offered plaintiff a diagnosis and treatment program. (AR 298.) Dr. Springer ordered an MRI of plaintiff's left shoulder on or about September 16, 2005. (AR 276.) On December 5, 2005, plaintiff was cleared for anesthesia and surgery. (AR 233-35.) Four days later, on December 9, 2005, Dr. Springer issued a pre-operative report and performed arthroscopic surgery on plaintiff's left shoulder. (AR 232, 235-37.) On January 4, 2006, Dr. Springer noted that plaintiff was doing quite well following the surgery. (AR 293.) Thus, plaintiff received medical attention between 2001 and 2004, and from 2004 to 2008, which the ALJ appears to have overlooked. Accordingly, the factual inaccuracies in the ALJ's decision "undermine[] any confidence [] that the evidence in the plaintiff's case has been fully and fairly considered," and thus, remand is appropriate. *See Renaudette*, 482 F. Supp. 2d at 132.

Defendant argues that the factual inaccuracies in the ALJ's decision are harmless error. However, these inaccuracies suggest a potential misunderstanding of the record, and should be resolved upon remand. In other words, the Court is unable to conclude that the overlooked information would not materially impact the ALJ's decision and, if in fact the ALJ reaches the same conclusion, the ALJ will need to address this information in applying the requisite factors to determine the weight that should be accorded to opinion of the treating physician. *See, e.g.*, *Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968) ("Thus it is clear that in summarizing and sifting the evidence in this case, the Hearing Examiner totally ignored a major piece of evidence which might well have influenced his decision. We cannot fulfill the duty entrusted to us, that of determining whether the Hearing Examiner's decision is in accordance with the Act, . . . if we cannot be sure that he considered some of the more important evidence presented, for Congress directed that in the first instance the Hearing Examiner is to make the findings of fact and decide the rights of individuals applying for benefits. . . ." (citations omitted)); *Armstead v. Chater*, 892 F. Supp. 69, 76 (E.D.N.Y. 1995)("[T]he Court is left to speculate whether all the circumstances of the petitioner's claim were thoroughly analyzed, or instead were overlooked. . . . Consequently, the Court is unable to find that the Commissioner's determination is supported by substantial evidence, and in this posture, a remand of this case to the Commissioner is appropriate." (citations omitted)).

Moreover, it is also unclear to the Court, without further analysis on the part of the ALJ, as to whether the ALJ fully considered Dr. Springer's records in concluding that Dr. Springer completely neglected to consider

14

plaintiff's activities of daily living. Dr. Springer, in his letter to plaintiff's counsel, stated that plaintiff's injuries "have severely restricted his ability to perform activities of daily living . . ." (AR 344.) However, Dr. Springer, in three separate statements between 2001 and 2005, noted that he encouraged plaintiff to undergo a home exercise program. (AR 225, 270, 298.) In a May 2006 attending physician's statement, Dr. Springer once again noted that plaintiff's treatment was a home exercise program. (AR 305.) When asked if, to the best of his knowledge, plaintiff was compliant with the home exercise program, Dr. Springer checked "Yes." (AR 305.) Plaintiff testified before the ALJ that he tried to incorporate his physical therapy into his housework. (AR 39.) Specifically, plaintiff stated that he would "incorporate some of those [exercises] into his daily activity." (AR 38.) Plaintiff, when asked if he performed any housework, stated that he vacuumed to stretch his arm and performed smaller chores that he liked to call "physical therapy." (AR 39.) Thus, plaintiff's testimony, and the administrative record, provides at least a reasonable inference that Dr. Springer, who recommended the home exercise treatment, was aware of plaintiff's daily activities at home and, therefore, may have considered plaintiff's daily activities when giving his opinions.

As stated *supra*, the specific reasons given by the ALJ for not affording Dr. Springer's opinion controlling weight were: (1) the lapse in treatment of the plaintiff, and (2) because "[h]e did not consider the claimant's activities of daily living, his fishing, use of a computer, his jobs and his ability to travel abroad." (AR 21-22.) However, because it appears that the ALJ overlooked certain information relating to those factual predicates, the record does not provide a sufficient basis for the ALJ to decline to give controlling weight to Dr. Springer's Opinion. Moreover, in determining that the consultative examiner report would be given "greater weight" than Dr. Springer's opinion, there is no indication that the ALJ considered: (i) the frequency of examination and length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. *see Clark*, 143 F.3d at 118 (citing 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2)).

Thus, the court will remand the case. *See, e.g.*, *Mieczkowski*, 2008 WL 899344, at * 11; *see also Risitano v. Comm'r of Soc. Sec.*, No. 06-CV-2206 (FB), 2007 U.S. Dist. LEXIS 58276, at *10, 2007 WL 2319793 (E.D.N.Y. Aug. 9, 2007) (remanding case and directing the ALJ to "identify the evidence [the ALJ] did decide to rely on and thoroughly explain . . . the reasons for his decision" if the ALJ did not intend to rely on the opinions of plaintiff's treating physicians); *Torregrosa v. Barnhart*, No. CV-03-5275, 2004 U.S. Dist. LEXIS 16988 (FB), at *18, 2004 WL 1905371 (E.D.N.Y. Aug. 27, 2004) (remanding because "(1) there is a reasonable basis to doubt whether the ALJ applied the correct legal standard in weighing the opinions of [the treating physicians], and (2) the ALJ failed to give good reasons for the weight, or lack thereof, given to those opinions"). Accordingly, upon remand, the ALJ must consider all the evidence and, if he continues to reject the opinion of Dr. Springer, the ALJ must clarify his reasons for declining to afford controlling weight to plaintiff's treating physician and consider the factors discussed *supra*.[5]

---

[5] Plaintiff also contends that the ALJ failed to properly assess plaintiff's credibility. The ALJ has an absolute duty and obligation to consider not only the plaintiff's testimony, but also the record as a whole.

III. CONCLUSION

For the reasons stated above, defendant's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is denied. Plaintiff's cross-motion for judgment on the pleadings is granted to the extent it seeks a remand for further proceedings. Accordingly, this case is remanded for further proceedings consistent with this Memorandum and Order. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 14, 2012
       Central Islip, New York

* * *

The plaintiff is represented by Christopher James Bowes, Office of Christopher James Bowes, 54 Cobblestone Drive, Shoreham, NY 11786. The attorney for defendant is Vincent Lipari, United States Attorneys' Office, Eastern District of New York, 610 Federal Plaza, Central Islip, New York, 1172.

---

*See Yancey*, 145 F.3d at 111; *Jones*, 949 F.2d at 59; *Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998); *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994). When the Court "concludes that the ALJ erred in applying the treating physician rule, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility." *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 267 (E.D.N.Y. 2010). The Court notes that the ALJ in this case found that the claimant's statements concerning the intensity, persistence and limiting effects of plaintiff's symptoms to be not credible. The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and quotations omitted). However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.